UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARK E. KENDRICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-03000-JRS-DML |
| | ) | |
| DAVE LIMBURG, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY REJECTING AFFIRMATIVE DEFENSE OF FAILURE
TO EXHAUST AVAILABLE ADMINISTRATIVE REMEDIES**

Defendant Dave Limburg has asserted the affirmative defense that Plaintiff Mark Kendrick failed to exhaust his available administrative remedies before initiating this civil rights action as required by the Prison Litigation Reform Act (PLRA). On November 14, 2018, this matter came before the Court for a hearing pursuant to *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008), to determine whether the Court should credit the exhaustion defense and enter judgment in Mr. Limburg's favor. The Court has reviewed the documentary evidence presented at the hearing, the testimony presented by Mr. Kendrick and Jail Commander Andrew Abney-Brotz, and the parties' proposed findings of fact and conclusions of law.

Mr. Limburg has not carried his burden of proving that Mr. Kendrick failed to exhaust an administrative remedy that was available to him. Therefore, Mr. Limburg's affirmative defense is **rejected**, and this action will proceed to resolution on the merits of Mr. Kendrick's claims.

### I. Exhaustion of Administrative Remedies

The PLRA requires that a prisoner exhaust his available administrative remedies before bringing a suit concerning prison conditions. 42 U.S.C. § 1997e(a); *see Porter v. Nussle,* 534 U.S.

516, 524-25 (2002). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Id.* at 532 (citation omitted).

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo,* 548 U.S. 81, 90-91 (2006) (footnote omitted); *see also Dole v. Chandler,* 438 F.3d 804, 809 (7th Cir. 2006) ("'To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require.'") (quoting *Pozo v. McCaughtry,* 286 F.3d 1022, 1025 (7th Cir. 2002)). "State law establishes the administrative remedies that a state prisoner must exhaust for purposes of the PLRA." *Lanaghan v. Koch,* 902 F.3d 683, 687 (7th Cir. 2018). "[A]n inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross v. Blake,* 136 S. Ct. 1850, 1859 (2016) (internal quotation omitted).

## II. Procedural Background

Mr. Kendrick is a prisoner committed to the custody of the Ohio Department of Rehabilitation and Correction and currently confined at the Ohio State Penitentiary at Youngstown. In the summer or 2017, Mr. Kendrick was confined at the Wayne County Jail in Indiana. This action is based on Mr. Kendrick's allegation that he was assaulted by other inmates at the Jail on June 26, 2017, and that Mr. Limburg, a Sheriff's Deputy employed at the Jail, failed to intervene to protect him.

Mr. Limburg asserted the affirmative defense that Mr. Kendrick's claims were barred under the PLRA because he failed to exhaust administrative remedies available through the Jail before

filing suit. On May 25, 2018, the Court denied Mr. Limburg's motion for summary judgment on the exhaustion defense, setting the stage for the *Pavey* hearing. *See* dkt. 58.

Although insufficient to resolve the exhaustion issue entirely, the evidence the parties presented at summary judgment substantially narrowed the questions left to be answered at the *Pavey* hearing. The parties agreed that, in June and July of 2017, the Jail maintained a grievance procedure that provided administrative remedies for Mr. Kendrick's failure-to-protect claim. The procedure required Mr. Kendrick to present a written grievance using an electronic kiosk no later than July 3—seven days after the assault—and he failed to do so. However, the record before the Court at summary judgment left open the question of whether Mr. Kendrick had access to the kiosk during that time. Accordingly, a *Pavey* hearing was necessary to determine whether the Jail's grievance procedure was truly "available" to Mr. Kendrick for purposes of the PLRA.

### III. Findings of Fact

An incident report by Mr. Limburg documents that Mr. Kendrick became involved in a physical altercation with two fellow inmates at approximately 2:30 P.M. on June 26, 2017. Stip. Ex. 1 at 1. During this altercation, Mr. Kendrick attempted to crawl under a table when another inmate grabbed him "by the right leg and started pulling it up and hitting on the under side of the bench." *Id.*

After this incident, Mr. Kendrick "was limping" and "looked pretty roughed up." *Id.* When Mr. Kendrick saw a doctor on July 3, he still had numerous abrasions on his back, an open wound on his finger, and two bumps on his head from the assault. Stip. Ex. 7 at 2. An x-ray showed no fractures or dislocations but did show a small parapatellar effusion, or excessive fluid, which can indicate a ligament injury. *Id.* Mr. Kendrick reported during the July 3 examination that, shortly after the assault, he saw white spots and experienced dizziness. *Id.*

Sometime after the incident, Mr. Kendrick was taken to the Jail's receiving area, where he received medical treatment. Dkt. 111 at 14:23–15:7. It is not clear what that treatment entailed, but notes from the July 3 medical examination indicate that Mr. Kendrick's knee was x-rayed on June 26. Stip. Ex. 7 at 2.[1] At approximately 4:55 P.M., Mr. Kendrick was moved to a padded cell in the receiving area. Stip. Ex. 3; dkt. 111 at 15:11–14.

There is a kiosk in the receiving area that inmates may use to file written grievances. Dkt. 111 at 11:8–11. There is no evidence that Mr. Kendrick attempted or asked permission to access the kiosk during the time he was in the receiving area. However, there also is no evidence showing how long Mr. Kendrick was in the receiving area, how much of that time he was receiving medical treatment, or whether he was even capable (due to his injuries) of using the kiosk to write a grievance at that time.

Mr. Kendrick remained in the padded cell from approximately 4:55 P.M. on June 26 until approximately 8:44 A.M. on June 28. Stip. Ex. 3. For the entire time Mr. Kendrick was confined to the padded cell, he was "administratively locked down." Dkt. 111 at 42:21–22.

An inmate on administrative lockdown is confined to his cell 23 hours per day and may leave his cell only when called by Jail staff for recreation time. *Id.* at 30:22–31:12. Recreation is available to administratively locked down inmates only between 11:00 P.M. and 4:00 A.M. *Id.* at 31:8–12. Jail staff call inmates for recreation through the intercoms in their cells. *Id.* at 31:13–22. If an inmate does not respond to the staff's call for recreation time—for example, if the inmate sleeps through the call—the inmate misses his chance. *Id.* at 31–23–32:1. Jail staff takes silence as a refusal of recreation and does not give the inmate another opportunity until sometime between 11:00 P.M. and 4:00 A.M. the following day. *Id.*

---

[1] Mr. Kendrick testified that he was x-rayed sometime after June 26, but there is no record of that x-ray. *See* dkt. 111 at 46:2–13.

If an inmate receives a call for recreation, he may use that time to shower, use the kiosk, and engage in other recreation. *Id.* at 24:13–18. Jail staff keeps a log tracking whether each inmate confined in the receiving area leaves his cell for recreation on a given day. *See* Stip. Ex. 4. The log notes what times the inmate exited and returned to his cell and also notes whether or not the inmate showered. *Id.*

Mr. Kendrick's administrative lockdown in the receiving area began on the afternoon of June 26. Because he arrived there after 4:00 A.M. on June 26, he was not offered recreation on June 26. *Id.* at 2.

Mr. Kendrick exited his cell for recreation at 1:20 A.M. on June 27, the first recreation period available during the time when he was administratively locked down in the padded cell. *Id.* at 1. Mr. Kendrick returned to the padded cell at 2:05 A.M. *Id.* There is no dispute between the parties that, during the 45 minutes Mr. Kendrick was out of his cell for recreation, he showered and completed a written request for medical treatment. Dkt. 111 at 34:8–19; 43:10–45:12; Stip. Ex. 2. Mr. Kendrick testified that this was his first opportunity to wash off blood that got on his body during the altercation. Dkt. 111 at 43:10–14. Mr. Kendrick did not access the kiosk while he was outside his cell on June 27.

Mr. Kendrick was taken for examination by a nurse at 2:35 P.M. on June 27. Stip. Ex. 7 at 1. His medical records indicate that he complained of pain and swelling to his right knee and of flashbacks to his assault the day before. *Id.* The nurse instructed Mr. Kendrick to slowly do range-of-motion exercises to relieve his knee pain and to seek additional treatment if his flashbacks continued. *Id.* She provided Mr. Kendrick with a two-week treatment of naproxen. *Id.*

Mr. Kendrick maintains that he was not offered recreation between 11:00 P.M. on June 27 and 4:00 A.M. on June 28. Commander Abney-Brotz did not testify to the contrary, and Mr.

5

Limburg has not contradicted Mr. Kendrick's testimony with any evidence. Mr. Limburg has not produced a recreation log for June 28. *See* Stip. Ex. 4.

On June 28, Mr. Kendrick was moved from the padded cell in the receiving area to cell 14 in housing unit B5. Stip. Ex. 3. Mr. Kendrick remained administratively locked down from the time he was moved to cell 14 on June 28 through July 3. Dkt. 111 at 24:33–12 47:7–14, 35:16–17, 48:5–17. Mr. Kendrick testified that he was not permitted to leave his cell for recreation during that time. *Id.* at 48:5–8. Again, Commander Abney-Brotz did not testify to the contrary, and Mr. Limburg has not contradicted Mr. Kendrick's testimony with any evidence, such as recreation logs for B-5. Commander Abney-Brotz states that, at some point, Mr. Kendrick was temporarily removed from his cell by Jail staff so it could be cleaned, but he does not recall whether this happened before July 3, and there is no evidence that Mr. Kendrick was permitted to access the kiosk while his cell was being cleaned. *Id.* at 36:6–37:6. There is no evidence that Mr. Kendrick was informed on June 26 or 27 that he would remain on administrative lockdown through July 3.

### IV. Analysis

The question of whether the Jail's grievance system was really available to Mr. Kendrick for purposes of the PLRA is decided primarily by two legal principles and two corresponding sets of facts.

First, the PLRA requires an inmate to grieve "'in the place, and at the time, the prison's administrative rules require.'" *Dole,* 438 F.3d at 809 (quoting *Pozo*, 286 F.3d at 1025). In this case, there is no dispute that the Jail's administrative rules required inmates to file grievances using the electronic kiosk. Therefore, Mr. Kendrick had access to the grievance system only when he had access to the kiosk. The evidence shows that Mr. Kendrick's access to the kiosk was extremely

limited—so limited that his failure to file a grievance during the brief period when he could access it does not preclude him from bringing this suit.

Second, "[p]risoners are required to exhaust grievance procedures they have been told about, but not procedures they have not been told about." *King v. McCarty*, 781 F.3d 889, 896 (7th Cir. 2015). "They are not required to divine the availability of other procedures." *Id.* An inmate must grieve according to the requirements set forth in his custodian's administrative rules—but he need not go above and beyond those requirements. The evidence shows that Mr. Kendrick did not go out of his way to access the kiosk when the Jail's rules made it unavailable to him, but nothing in the PLRA or the Jail's grievance process required him to do so.

**A.     Access to Kiosk**

This suit arises from the altercation that took place on June 26, 2017. The Jail's grievance procedure required Mr. Kendrick to submit a written grievance using the kiosk by July 3, 2017, seven days later. Mr. Kendrick was confined under administrative lockdown from 4:55 P.M. on June 26 through the end of the grievance period on July 3. When an inmate is confined under administrative lockdown, he may not access the kiosk—and therefore may not complete the grievance process—except when released by Jail staff for recreation. Therefore, Mr. Kendrick could only have filed a grievance using the kiosk (1) before he was placed on administrative lockdown at 4:55 P.M. on June 26, or (2) when he was released for recreation thereafter.

**1.     Access to Kiosk Before Administrative Lockdown**

There is no evidence that Mr. Kendrick had discretionary time to access the kiosk and write a grievance on June 26, 2017, before being moved to administrative lockdown in the padded cell. The altercation began about 2:30 P.M., and he was moved to the padded cell about 4:55 P.M. After the altercation ended, Jail staff moved Mr. Kendrick to the receiving area. Once in the receiving

7

area, Mr. Kendrick received medical attention. It is not clear what that treatment entailed. But the list of injuries documented in the record—numerous abrasions on his back, an open wound on his finger, two bumps on his head, dizziness, seeing spots, and a leg injury that warranted x-rays—suggests the examination would have lasted more than a few minutes.

There is no definitive accounting of of how Mr. Kendrick spent the two hours and twenty-five minutes between the beginning of the altercation and his movement to the padded cell. But the evidence suggests that he was occupied and under the control of Jail and medical staff for most or all of it. Mr. Limburg faces the burden of showing that the grievance process was available to Mr. Kendrick, and no evidence shows that he had an opportunity to access the kiosk during this period. Moreover, for reasons the Court discusses further below, even if Mr. Limburg could have accessed the kiosk during this time, his failure to file a grievance at that time would not necessarily bar his suit under the PLRA given his inability to access it afterward.

### 2. Access to Kiosk During Administrative Lockdown

The evidence shows that Mr. Kendrick was given the opportunity to leave his cell for recreation one time between 4:55 P.M. on June 26 and July 3. Commander Abney-Brotz has testified that, as a matter of protocol, inmates on administrative lockdown were called for recreation every day. But Mr. Kendrick testified that he was called for recreation only on June 27. Mr. Limburg has not presented any evidence—no recreation logs, no witness testimony—to rebut that testimony and show that Mr. Kendrick was called for recreation even once after June 27.

Mr. Limburg's assertion that Mr. Kendrick's testimony lacks credibility does not fit with the procedural posture of this action. Mr. Limburg must prove his affirmative defense. All the evidence in the record shows that Mr. Kendrick was confined to administrative lockdown for nearly the entire grievance period and that inmates so confined could only access the grievance

system when released from their cells for recreation, and Mr. Limburg has not presented any evidence showing that Mr. Kendrick was offered recreation from June 28 onward.[2]

Given the injuries described—most notably dizziness and seeing spots—the Court questions whether Mr. Kendrick was physically and mentally capable of writing a grievance on June 26 or in the early hours of June 27, when he was offered recreation. It is well settled that "a remedy is not 'available' within the meaning of the Prison Litigation Reform Act to a person physically unable to pursue it." *Hurst v. Hantke*, 634 F.3d 409, 412 (7th Cir. 2011); *see also Lanaghan*, 902 F.3d at 689 (finding grievance process unavailable to inmate because "he was unable to use his hands sufficiently to fill in the form" and "there was no testimony and no finding by the district court that Lanaghan was physically capable of remaining there for any length of time, or waiting in his cell and later returning to the dayroom") (applying *Hurst*, 634 F.3d at 412).

Even assuming, though, that Mr. Kendrick's injuries did not prevent him from filing a grievance, Mr. Limburg has not established that the grievance process was available to Mr. Kendrick to the extent necessary to resolve this case on the exhaustion defense. The Jail's grievance process demanded that Mr. Kendrick file a grievance using the kiosk in a seven-day period, and the Jail imposed conditions on Mr. Kendrick—administrative lockdown—that prevented him from accessing the kiosk for the final six days of that period.

As Chief Judge Magnus-Stinson noted in deciding Mr. Limburg's motion for summary judgment,

---

[2] Both at summary judgment and at the *Pavey* hearing, the parties devoted considerable attention to the question of whether the general inmate population was able to access the kiosk from June 26 through July 3 as plumbing repairs were being completed in the Jail and inmates were generally confined to their cells. But this is not a relevant issue if Mr. Kendrick was, as all the evidence indicates, confined under administrative segregation for the duration of this period. If Mr. Kendrick was only permitted to leave his cell during his daily recreation time, the conditions of his fellow inmates' confinement and their access to the kiosk are not relevant

9

> Deputy Limburg has not provided any authority to support the proposition that an administrative process requiring an inmate to take action in a seven-day period is legally available even if he is denied access to it for six of the seven days. The Court is unaware of any precedent supporting this proposition.

Dkt. 58 at 6. Mr. Limburg still has not presented any legal authority supporting the conclusion that the Jail's kiosk-based grievance program was "available" to Mr. Kendrick even though the Jail staff imposed conditions that prevented him from accessing the kiosk on days two through seven of the grievance period.

Notably, Mr. Kendrick has presented case law supporting the opposite conclusion. Mr. Kendrick refers the Court to *White v. Bukowski*, 800 F.3d 392 (7th Cir. 2015). White was jailed during the final days of her pregnancy and delivered a child that "suffered serious birth defects" that she attributed to conditions of her confinement. *Id.* The jail's grievance procedure did not impose a formal filing deadline, but the jail subjected White to a practical deadline by transferring her to a different jail four days after the delivery. *See id.* at 396. Moreover, "the jail would not entertain a grievance filed by a person no longer detained in the jail." *Id.* at 397. White did not know the transfer was coming until it happened, and she had not filed a grievance at that point. *Id.* at 396.

The Seventh Circuit found the grievance procedure was unavailable to White. "[B]ecause she didn't know when she'd be transferred," the court reasoned, "her possible administrative remedies had no knowable deadline." *Id.* "Uninformed about any deadline for filing a grievance—not told that her transfer date would be the deadline or when that transfer date might be—the plaintiff cannot be faulted for not having filed a grievance before she was transferred from the jail for good." *Id.* at 397. The court added that, even if White knew she had a limited time to grieve, the process would not truly have been available to her given that she had "just given birth to a severely impaired child." *Id.*

*White* is not a perfect factual analogue to this case, but the Court finds it instructive. In both cases, a prisoner had a period in which to file a grievance under the jail's rules. In both cases, circumstances outside the prisoner's knowledge or control cut that period short. There is no evidence that Mr. Kendrick knew (or even that he should have known) on June 26 or 27 that he would remain on administrative lockdown through July 3. The Court finds that the same logic applied in *White* should apply in this case: Uninformed that he would not be able to access the kiosk for the final six days of the grievance period, Mr. Kendrick cannot be faulted for not filing a grievance on the first day. The evidence does not establish that the Jail's grievance process was ever available to Mr. Kendrick.

**B.     Failure to Request Access to Kiosk**

Mr. Limburg argues that the Jail's grievance process remained available to Mr. Kendrick even while he was confined under administrative lockdown because any reasonable inmate in his position would simply have asked to be released from his cell so he could file a grievance. In other words, Mr. Limburg argues that the PLRA did not permit Mr. Kendrick to simply follow the rules the Jail imposed on him but instead compelled him to ask the Jail staff to grant him an exception. Mr. Limburg bases this position on the legal argument that, "where an inmate undertakes no effort or even minimal effort to communicate a request to access the grievance process," the PLRA does not forgive the inmate's failure to exhaust the grievance process. *See* dkt. 113 at 7. But that proposition does not align with the law of this Circuit as applied to the specific facts of this case.

Mr. Limburg grounds his argument in two unpublished decisions. The first, *Watson v. Hughes*, 439 F. App'x 300 (5th Cir. 2011), is five paragraphs in length. One of the five considers the constitutionality of a grievance procedure applicable to Texas prisoners, an issue with no significance for Mr. Kendrick's case. *See id.* at 302. The Fifth Circuit found that Watson failed to

take all the steps that were necessary to exhaust the grievance procedure that applied to him, but it provided almost no details of the grievance procedure's requirements or Watson's efforts to exhaust it. Indeed, the Fifth Circuit explained only that Watson was required to complete a two-step grievance process, that Watson misunderstood a timing requirement, and that he was told sometime during the grievance period that grievance forms were unavailable. *See id.* at 301–302. With so little information, the Court cannot determine whether the Fifth Circuit's reasoning translates logically to Mr. Kendrick's case.

The second case, *Davis v. Buncich*, No. 2:14-cv-341, 2017 WL 713685 (N.D. Ind. Feb. 23, 2017), is more robust but still not clearly applicable to this situation. The jail at issue in that case also maintained a two-step grievance procedure, but the opinion includes no details about the manner in which the jail's policy required prisoners to file written grievances. The court described three efforts by Davis to speak with jail personnel, found that a "'person of ordinary firmness' would not have been deterred from exhausting" by the staff's responses, and concluded that no evidence suggested that the administrative process was unavailable to Davis. *See id.* (quoting *Schultz v. Pugh*, 728 F.3d 619, 621 (7th Cir. 2013)). But without knowing the grievance procedure's requirements, this Court cannot determine how that decision might apply to this case.

The specific demands of the grievance policies in those cases are important because "[t]he availability of a remedy is . . . a fact-specific inquiry." *Lanaghan*, 902 F.3d at 688. The "proper focus" is on whether the inmate was "not able to file the grievance within the proper time period through no fault of his own." *Id.* In other words, the Court must consider the alignment between the demands a jail's administrative procedures place on a prisoner and the reality the jail staff imposes on the prisoner by the conditions under which it confines him. The PLRA requires that an inmate file grievances "'in the place, and at the time, the prison's administrative rules require.'"

*Dole,* 438 F.3d at 809 (quoting *Pozo*, 286 F.3d at 1025), but it "does not 'demand the impossible,'" *Lanaghan*, 902 F.3d at 688 (quoting *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016)).

The Jail's administrative procedure specifically required Mr. Kendrick to file a grievance using the kiosk in a seven-day period. In reality, the Jail confined Mr. Kendrick under administrative lockdown for the entirety of that period. The Jail prevented Mr. Kendrick from accessing the kiosk except when summoned for recreation, and he was summoned only on the first of the seven days. "Prison authorities cannot immunize themselves from suit by establishing procedures that in practice are not available because they are impossible to comply with . . . ." *King*, 781 F.3d at 893. To find for Mr. Limburg under these circumstances would afford the Jail such immunity. Therefore, the Court must find that the grievance process was not available to Mr. Kendrick.

## V. Conclusion

For the reasons discussed above, Mr. Limburg's defense of failure to exhaust available administrative remedies is **rejected**. The action shall now proceed to the merits of Mr. Kendrick's claims. The Court will issue a schedule for those proceedings by a separate Order.

The Court expresses its appreciation to Melissa Macchia, whom the Court appointed for the limited purpose of assisting Mr. Kendrick with his *Pavey* hearing. Because that hearing has concluded, Ms. Macchia may file a motion to withdraw. Of course, if Ms. Macchia wishes to continue her representation, the Court will welcome her continued participation.

**IT IS SO ORDERED.**

Date: 3/25/2019

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

MARK E. KENDRICK
505231
OHIO STATE PENITENTIARY
878 Coitsville-Hubbard Rd
Youngstown, OH 44503

Matthew L. Hinkle
COOTS HENKE & WHEELER
mhinkle@chwlaw.com

Melissa A. Macchia
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
mmacchia@taftlaw.com

John Vincent Maurovich
COOTS, HENKE & WHEELER
jmaurovich@chwlaw.com